Filed 3/12/14  P. v. Cooksey CA5

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | F066535 |
| v. | (Super. Ct. No. CRF38682) |
| JUSTIN JACOB COOKSEY, | **O P I N I O N** |
| Defendant and Appellant. | |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

William I. Parks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*        Before Gomes, Acting P.J., Franson, J., and Peña, J.

A jury convicted appellant, Justin Jacob Cooksey, of assault with a deadly weapon (count 1/Pen. Code, § 245, subd. (a)(1)),[1] battery with serious bodily injury (count 2/§ 243, subd. (d)), misdemeanor battery (count 3/§ 242), and misdemeanor vandalism (count 4/§ 594, subd. (a)). The jury also found true a great bodily injury enhancement (§ 12022.7, subd. (a)) in count 1.

On January 17, 2013, the court sentenced Cooksey to an aggregate seven-year term, the upper term of four years on count 1, a three-year great bodily injury enhancement in that count, a stayed, concurrent four-year term on count 2, a concurrent six-month term on count 3, and a concurrent one-year term on count 4.

On appeal, Cooksey contends he was denied the effective assistance of counsel by defense counsel's failure to: 1) object to certain hearsay evidence and character evidence; 2) properly cross-examine a prosecution witness; and 3) object to improper remarks by the prosecutor during closing arguments. We affirm.

## FACTS

*The Prosecution Case*

Rochelle Deutsch (Rochelle) testified that on May 27, 2012, she and her husband, Leonard Deutsch (Leonard) decided to take their two children, ages six and two, in their pickup truck to Don Pedro Lake. As Leonard drove south on Highway 132 from Coulterville toward La Grange a white Chevy sedan came up behind them honking its horn and flashing its lights. The car then passed them at a "blind corner" where Merced Falls Road dead ends at Highway 132 and where there was a double yellow line on the highway. According to Rochelle, the car had five occupants including the right rear seat passenger, who Rochelle later learned was Cooksey and the driver, who Rochelle later learned was Cooksey's sister, Bailey Cooksey (Bailey).

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

2

The car traveled a short distance farther and turned into Don Pedro Market. Although the Deutsches had not intended to stop at the market, they followed the car into the parking lot and parked next to it in order to confront the occupants about the way their car had passed them.  As Bailey got out of the driver's side and started walking to the market, the Deutsches started yelling things like, "What the hell?  Why are you passing us like that?"  Cooksey then got out of the car, stood right in front of Leonard's face and yelled "What the F?"  The Deutsches replied, "Why are you passing us like that?"  Delia Doiron, a clerk at the market, soon came out of the store and told Cooksey, "God damn it, Jacob, don't start this shit again or I'm calling the f-ing cops."

At that point, the Deutsches got back into their truck, drove south on Highway 132 a short distance, and parked in a turnout next to Don Pedro Lake.  Leonard then got out of the truck and began releasing the truck seat to let the children out.  As Rochelle was undoing her seat belt, she saw something out of the corner of her eye and heard Leonard hit the side of the truck.  Rochelle looked and saw a man whom she identified in court as Cooksey[2] swing a tire iron at Leonard twice.[3]  She finished undoing her seat belt, got out of the truck, and ran to her husband who by then was lying unconscious on the ground with his head and right shoulder under the bed of the truck.  Rochelle said, "What the fuck?"  Cooksey turned around, dropped the tire iron and made a growling sound.  He then stepped toward Rochelle and punched her once on the head.  Rochelle said, "What the F?  I'm a girl."  Cooksey replied that he did not care and punched her again.  Rochelle protested that her kids were in the truck and was struck on the back of the head by Bailey.

---

[2]     Rochelle also identified Cooksey in court as the man with whom they argued in the market parking lot.

[3]     According to Rochelle, the tire iron, which was L shaped, had been on the truck's floorboard before the assault and Leonard must have kicked it out of the truck when he got out.

As Bailey ran back to her car, Cooksey picked up the tire iron and threw it at the windshield of the Deutsches' truck, leaving a large shattered area on the driver's side and two cracks that extended to the passenger's side. Cooksey then ran toward his car and after he and the other riders got in, the car drove off.[4]

Meanwhile, Rochelle tried unsuccessfully to wake Leonard. She then flagged down a truck with two male occupants, one of whom assisted her with Leonard while the other one left to call the sheriff's department. Eventually, the fire department and an ambulance arrived and Leonard was transported to a hospital.

Rochelle was told by fire department personnel that she could not drive the truck because of the damage to the windshield. However, Rochelle knew one of the firemen and he drove the truck with her and her children back to the market. While the fireman sat with her children in the truck, Rochelle walked inside the market with blood on her hands looking like she had been crying. Doiron saw her and asked what was wrong. Rochelle replied that Leonard had been attacked. When Doiron asked by whom, Rochelle replied, "That f-ing prick from the parking lot." Doiron told Rochelle that the man they encountered earlier in the parking lot was Cooksey and that the woman driving the car Cooksey had been in was his sister, Bailey.

Two days after the assault, Tuolumne County Sheriff's Deputy Matthew Stuart showed Rochelle a photographic lineup and she unequivocally picked Cooksey out of the lineup as the man who assaulted her and Leonard.

Doiron testified she worked at Don Pedro Market and knew Cooksey because he was a customer there. On the day of the incident in the market's parking lot, she heard arguing outside and went to check. Upon seeing Cooksey and Leonard arguing, she

---

[4]     Although all the car's occupants got out of the car and were "standing there," only Cooksey and Bailey participated in the assault.

4

yelled out to Cooksey, "Fuck no, Jake. I don't want any of your shit here. Go inside, get your beer, and go." A few more words may have been exchanged before Cooksey walked into the market and Leonard got into his truck. Doiron apologized to the Deutsches and they left. Cooksey was in the store a short while before his group drove off.[5]

That evening Rochelle returned to the market. She was a mess and seemed very agitated when she asked Doiron if she had a minute. Doiron asked if something was wrong and if she was okay. Rochelle said no and was about to cry when Doiron said, "They followed you." Rochelle replied affirmatively.

The following day a deputy showed Doiron a photo lineup and she identified Cooksey as the man she saw arguing with Leonard in the parking lot.

Leonard testified he and Rochelle were driving to Don Pedro Lake to go fishing when a gray car that was honking and driving crazy passed them near the intersection of Merced Falls Road where there is a double yellow line painted on the highway. Leonard followed the car less than a quarter mile to Don Pedro Market and parked next to it. After they began arguing with a man and a woman from the car, a cashier came out and started yelling at the man and woman. Leonard then continued driving south on Highway 132 and stopped at a turnout. Leonard did not recall anything that happened after he stopped there.

As a result of the assault Leonard suffered fractures around one eye, his sinuses were smashed, he suffered various cuts and abrasions, he received stitches over his right

---

[5]     On redirect examination, Doiron testified that he might have been in there as long as seven minutes. Also, according to Doiron, Cooksey was in a light, possibly silver, four-door Chevy sedan.

eye and on his left lower jaw, and some of his teeth were broken.[6] Leonard identified Cooksey in court as the man he argued with that day.

Deputy Stuart testified that on May 27, 2012, at 9:50 p.m. he was able to obtain a statement from Leonard at Sonora Regional Medical Center. Although he was having difficulty speaking, Leonard told him that when he drove into the turnout he saw the gray vehicle "from the market."

On May 29, 2012, Deputy Stuart showed a photographic lineup to Rochelle and she positively identified Cooksey as the man who assaulted them.

Deputy Stuart spoke with Cooksey on June 3, 2012. Cooksey told the deputy he was with his cousin, Hailee Smith; his sister, Bailey; and Joseph Santana on the day he got in an argument at the market with some people in a white truck. According to Cooksey, after the clerk came out and yelled, he went in the store. After leaving the market, Cooksey's group went to Cooksey's residence in La Grange. Cooksey did not see the white truck again.

Deputy Stuart attempted to contact Bailey and Santana and left messages for them to call him back but neither of them ever did. He was, however, able to contact Smith.

During cross-examination, Deputy Stuart testified that Rochelle told him the car's occupants were honking and yelling. She also told him that the turnout was a dirt turnout and that the other car was gray.

*The Defense*

Bailey testified that in the early afternoon of May 27, 2012, she drove north on Highway 132 from Cooksey's house on Jalapa Way to Don Pedro Market in a silver

---

**6** Leonard's medical records apparently indicated he had a .163 blood alcohol content when he was treated for his injuries.

Ford.**7**  On the way, her car was behind a small white truck when it swerved off the road to the right.  The truck then overcorrected, almost hit an R.V. going in the opposite direction, and drove into a dirt turnout on the left side of the road.  Bailey heard the R.V. honk and she kept driving.  After parking at the market, Bailey saw the white truck parked next to her.  When she got out she heard a woman yelling and screaming at her and the man in the truck confronting Cooksey.  The woman was yelling that she and the driver were locals and that Bailey's group was not allowed to honk their horn at them.  Bailey was certain the truck was the same one she had seen earlier and she denied honking her horn at the woman's truck.  According to Bailey, a woman from the market came out and told Bailey's group they needed to go in the store to make their purchase and she told the people in the truck to leave.  The truck left while Bailey was in the store with Santana and Cooksey buying drinks for their barbeque.  After leaving the market, Bailey and her group drove south on Highway 132 back to Cooksey's house.  She did not stop anywhere between the market and Cooksey's house.  Although she saw other cars in the turnouts she passed, she did not see the white truck.  Bailey did not hear the woman from the store apologizing to the people in the truck or making any statements to Cooksey.  Bailey also testified that she called Deputy Stuart back, once leaving a voice mail, but she was not able to get a hold of him.

Santana testified he went with Bailey, Smith, and Cooksey from Cooksey's house to Don Pedro Market.  On the way an R.V. honked at a white truck that veered off the road, came back on it, and cut off the R.V.  After they pulled into the store parking lot, some people in the truck began causing trouble.  Doiron "kicked them out" and told Santana and his group to go in the store and get what they needed.  Afterwards, Santana's

---

**7**  Cooksey's house was located off of Highway 132 south of Don Pedro Market in La Grange.

group got on Highway 132 and went back to Cooksey's house. They did not stop and Santana did not see the white truck on the way. Santana denied that Doiron made any statement to Cooksey or yelled at him. He also initially testified that although he never spoke with Deputy Stuart he called him and left a message a few times. Later in his testimony he claimed he actually spoke with the deputy, that Stuart only asked a couple of questions, and all he wanted to know was whom Santana had been with.

Smith testified she rode in the front passenger's seat when they went to the market. On the way a white pickup swerved, overcorrected, and almost hit an R.V. At the market, before anyone got out of the car she was in, a woman got out of a small white pickup and was yelling that Cooksey's group could not honk at them because they were locals. Doiron then walked out of the market and told the people in the truck that they needed to leave or else she would call the police. Smith did not go into the store. The group did not stop anywhere on the way back to Cooksey's house and Smith did not recall seeing the white truck. During cross-examination, Smith admitted she did not mention anything about an R.V. when Deputy Stuart interviewed her. She also admitted she told Deputy Stuart she too had gone in the store. Smith denied that Doiron told Cooksey anything and she did not recall Doiron apologizing to the couple.

### Rebuttal

Deputy Stuart testified in rebuttal that during his interviews of Smith and Cooksey a few weeks after the incident at the market, neither of them mentioned anything about an R.V. Deputy Stuart also testified that Santana never spoke with him, that he checks his voice mail almost every day, and that he never received a voice mail from anyone, including Bailey, regarding the case.

## DISCUSSION

### Introduction

Cooksey contends he was denied the effective assistance of counsel by defense counsel's failure to object to the following statements which he claims were inadmissible hearsay and character evidence: 1) Rochelle's testimony that while she and Leonard were arguing with Cooksey and his sister in the market parking lot, Doiron came out of the market and stated, "God damn it, Jacob, don't start this shit again or I'm calling the f-ing cops[]"; 2) Doiron's testimony that she came out of the market and stated, "Fuck no, Jake. I don't want any of your shit here. Go inside, get your beer, and go[;]" and 3) Doiron's testimony that when Rochelle returned to the market after the assault, Doiron stated, "They followed you." Cooksey further contends he was denied the effective assistance of counsel by defense counsel's failure to cross-examine Rochelle about her ability to perceive events the day the assaults occurred, and by her failure to object to improper comments by the prosecutor during closing arguments.

According to Cooksey, these instances of defense counsel's failure to object were prejudicial because the prosecution case was weak in forensic evidence, investigation, and credible witnesses, and during closing arguments the prosecutor exploited these inadmissible statements when she argued:

> "... and she testified that she apologized to the couple for [Cooksey]. [¶] Why would she be apologizing for him? Makes you wonder if she's had other incidents with him, right? Because why would she be apologizing for his actions? [¶] … [¶] Miss Doiron looks at [Rochelle] and says, 'They followed you.' [¶] Miss Doiron knows it right from the get go. She knows exactly what happened. Her very first inclination is that they followed them and did this. Why would she say that unless the defendant is capable of this behavior? That came out of the -- the first thing out of her mouth is, 'They followed you, didn't they?' Why would she say that?"

"We have previously explained that, '[i]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient"

9

because his "representation fell below an objective standard of reasonableness ... under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]'" (*In re Avena* (1996) 12 Cal.4th 694, 721.)

"[However,] a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

### *The Failure to Object to Certain Evidence and a Portion of the Prosecutor's Closing Argument*

Evidence Code section 1200 provides:

"(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.

"(b) Except as provided by law, hearsay evidence is inadmissible."

Evidence Code section 1101 provides:

"(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, …) other than his or her disposition to commit such an act.

10

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Rochelle and Doiron both testified that Doiron essentially told Cooksey in the parking lot to get his beer and leave, whereas the defense witnesses claimed that Doiron told the Deutsches to leave. Therefore, Rochelle's testimony that Doiron told Cooksey not to "start this [] again" was admissible to impeach the defense witnesses, notwithstanding that it contained hearsay or character evidence and may have been otherwise inadmissible. In any event, when Doiron allegedly made this statement, Cooksey and his sister were arguing with Rochelle and Leonard in the market parking lot. Given the context in which it was uttered, the prejudice to Cooksey from this statement was minimal because, at most, it implicated Cooksey only in a prior argument with someone in the market parking lot.

Doiron's testimony that she told Cooksey she did not want "any of [his] shit here" even assuming it was a different statement than the one attributed to her by Rochelle and that it was character evidence, was also admissible to impeach the defense witnesses' claim that Doiron ran the Deutsches out of the parking lot and did not yell at Cooksey. Further, the prejudicial impact of this second statement was even less than that of the first statement because it referred to Cooksey's conduct at the time, did not suggest prior similar conduct by him, and the only matter it asserted for its truth was Doiron's state of mind, i.e., that she did not want him to act the way he was acting at the time.

Further, Doiron's testimony that she told Rochelle, "They followed you," occurred after Rochelle had already testified that upon returning to the market she told Doiron her husband had been attacked by "that f-ing prick from the parking lot." Thus, it should have been clear to the jury from the context of Doiron's statement that it was not based on her personal knowledge and was merely a conclusion she reached based on Rochelle's statements to her. Further, this statement by Doiron did not add anything to the prosecution case because if the jury believed Rochelle's statement that her husband had

11

been attacked by the man in the parking lot, they would have had to conclude, as Doiron obviously did, that Cooksey and his group followed them. On the other hand, if they did not believe this statement by Rochelle, they would have to conclude that Doiron's statement that Cooksey's group followed the Deutsches was wrong because it obviously was a conclusion Doiron reached based on Rochelle's statement. Thus, even assuming Doiron's statement, "[t]hey followed you" was inadmissible hearsay or character evidence, its admission did not prejudice Cooksey.

The prosecutor's comments during closing argument, however, are more problematic. "A prosecutor may fairly comment on and argue any reasonable inferences from the evidence. [Citation.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112.) However, "[a] prosecutor may not suggest the existence of ""'facts'"" outside of the record by arguing matters not in evidence. [Citation.]" (*Id.* at p. 113.)

Here, the prosecutor's statement that Doiron's statement "[m]akes you wonder if she's had other incidents with him ..." suggests the existence of facts outside the record, i.e., that Doiron had experienced prior incidents where Cooksey had argued with market patrons. Further, the prosecutor's statement that Doiron knew exactly what happened and her rhetorical question, "Why would she say ['they followed you'] unless the defendant is capable of this behavior" suggested Doiron knew, based on facts outside the record, that Cooksey was capable of committing a brutal assault. The defense forfeited any issue of prosecutorial misconduct with respect to these portions of the prosecutor's closing argument by defense counsel's failure to object, move to strike the statement, and seek a curative admonishment. (*People v. Tully* (2012) 54 Cal.4th 952, 1010.) Nevertheless, we must examine whether there is any prejudice inherent in these statements in order to resolve Cooksey's ineffective assistance of counsel claim.

It was undisputed at trial that within minutes after Cooksey and his sister were involved in a heated argument with the Deutsches, the couple stopped at a turnout and a

12

man brutally attacked Leonard with a tire iron and that Rochelle was punched by the same man and a woman. Further, the encounter at the market and the assault occurred in the daytime and both incidents lasted long enough for Rochelle to get a good look at Cooksey at the market and at the man who attacked them at the turnout. Within hours of the assault Rochelle returned to the market and unequivocally identified the man whom the Deutsches argued with at the market as the man who assaulted her and Leonard. Two days later she positively identified Cooksey as the man who assaulted her and Leonard when she picked his photo out of a photo lineup and she repeated her identification at trial. Additionally, Leonard told Deputy Stuart that after leaving the market he saw the car Cooksey was in stop at the turnout where he and Rochelle stopped.

Moreover, Doiron was a neutral witness and she corroborated Rochelle's testimony that at the market Doiron yelled at Cooksey and apologized to the Deutsches for Cooksey's behavior. By doing so, she also contradicted claims by defense witnesses that she ran the Deutsches out of the parking lot, did not apologize to them, and did not yell anything at Cooksey.

Further, two defense witnesses testified that the Deutsches complained to Cooksey about his group honking at them. Under the defense version of events, there was no reason for the Deutsches to argue with Cooksey and Bailey about being honked at. Thus, this testimony bolstered the prosecution's case because it corroborated a key detail of the Deutsches' version of events, i.e., that while traveling south on Highway 132 they followed Cooksey's group to the market because Cooksey's group had flashed their lights and honked at the Deutsches as they passed them in an unsafe manner. It also undermined the credibility of the defense witnesses because they claimed that the encounter occurred on Highway 132 south of the market and that Bailey did not honk at the Deutsches.

13

It was also undisputed that the Deutsches were assaulted at a turnout just south of Don Pedro Market. And several defense witnesses testified that the Deutsches' truck was the same white truck they saw ahead of them veer off the road, overcorrect, and almost crash head-on with an R.V. Given the recency and emotional impact of the white truck almost hitting an R.V. head-on and the alleged involvement of that truck's occupants in a heated argument with Cooksey and Bailey, the claim by several defense witnesses that none of them saw the Deutsches' white pickup truck stopped at the first turnout south of the market was simply incredible.

Additionally, Santana changed his testimony on the stand. First, he testified that he returned Deputy Stuart's calls but was not able to get a hold of him. Then, he testified that he called the deputy and spoke to him once. However, Santana's testimony was contradicted by Deputy Stuart's testimony that Santana never returned his calls. It was also dubious because Santana claimed that when he spoke with Deputy Stuart all the deputy wanted to know was who he was with the day of the assault. However, it is inherently improbable that a deputy investigating a serious crime, as occurred here, would ask a potentially crucial witness only whom he was with around the time the crime occurred.

Finally, we note that Deputy Stuart contradicted Bailey's testimony that she called him back and left a voice mail message and that the defense version of events was further undermined by the failure of Cooksey and Smith to mention anything about an R.V. when they were interviewed by Deputy Stuart. In sum, the prosecution's evidence established that Cooksey had a motive for the assault and that the assault occurred shortly after the event giving rise to the motive. It also included strong identification evidence by a victim/witness whose testimony was corroborated in significant part by a neutral witness and the undisputed fact that the argument at the market included complaints about Cooksey's group honking at the Deutsches. In contrast, the defense version was

14

fraught with the numerous problems discussed above. Thus, we conclude it is not reasonably probable Cooksey would have received a more favorable outcome even if defense counsel had objected to the challenged statements and improper remarks by the prosecutor and the court had excluded them.

***The Failure to Cross-Examine Rochelle About Her Ability to Perceive Events***

Cooksey contends his defense counsel provided ineffective representation by her failure to cross-examine Rochelle regarding her "ability to perceive events" the day she and Leonard were assaulted. We disagree.

"'As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation. [Citations.] Defendant identifies no exculpatory or impeachment evidence that counsel could have revealed by further questioning of prosecution witnesses [or examination of defense experts] and that would have produced a more favorable result at trial. [¶] ... Such claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused. [Citations.] *We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.*' [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 334, italics added.)

Cooksey appears to contend that certain circumstances suggested that the day Rochelle and Leonard were assaulted, Rochelle was under the influence of alcohol to the extent it affected her "ability to perceive events."[8] He further appears to contend that this should have prompted defense counsel to cross-examine her in that regard and that he was denied the effective assistance of counsel by his counsel's failure to do so. However,

---

[8] For example, he suggests that Rochelle's conduct in allowing Leonard to drive even though he had apparently been drinking and had a high blood alcohol content may indicate that she did not drive because she was more intoxicated than he was.

it was undisputed that the encounters in the parking lot and at the turnout occurred during daylight hours and that each one lasted long enough for Rochelle to get a good look at Cooksey and at the man who assaulted her and Leonard. Further, even though Rochelle was not previously acquainted with Cooksey, within hours she was able to identify "the ... prick from the parking lot" (Cooksey) as their assailant and two days later she unequivocally picked Cooksey's photo out of a photo lineup. Given these circumstances, even if defense counsel had established through cross-examination that Rochelle consumed alcohol prior to being assaulted, it is doubtful counsel could also have established that it adversely affected Rochelle's ability to perceive or remember who assaulted her and Leonard.

Accordingly, we conclude that Cooksey has failed to show that his defense counsel's performance was deficient because she failed to cross-examine Rochelle regarding her alcohol consumption and how it might have affected her ability to perceive and remember. Alternatively, we conclude that Cooksey was not prejudiced by defense counsel's failure to cross-examine Rochelle in this regard because, as discussed earlier, the prosecution presented a strong case and the defense case was undermined by the numerous problems discussed earlier. Moreover, we further conclude that even if the errors complained of are considered cumulatively, they did not prejudice Cooksey. It follows that Cooksey was not denied the effective assistance of counsel.

## DISPOSITION

The judgment is affirmed.

16